UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Allan Block Corporation,

      Plaintiff,

v.

Shoreline Stone Manufacturing Carib, Inc.,
Shoreloc Design Group Inc., Jason Stell, and
Joann Stell,

      Defendants.

File No. 25-cv-1914 (ECT/DTS)

**OPINION AND ORDER**

---

Jason R. Asmus, Schaan Barth, and Sean Smallwood, Taft Stettinius & Hollister LLP, Minneapolis, MN, for Plaintiff Allan Block Corporation.

Joel Andersen and Mollie Clark Ahsan, Nilan Johnson Lewis PA, Minneapolis, MN, for Defendants Shoreline Stone Manufacturing Carib, Inc., Shoreloc Design Group Inc., Jason Stell, and Joann Stell.

---

This diversity case[1] has its origins in a contract between Plaintiff Allan Block

Corporation and Defendant Shoreline Stone Manufacturing Carib, Inc.  Under the contract,

---

[1]    Based on the operative Amended Complaint's allegations, there is subject-matter jurisdiction over this case under the general diversity statute.  The case is "between . . . citizens of different states."  28 U.S.C. § 1332(a)(1).  Allan Block alleges it is incorporated under Minnesota law and maintains its principal place of business there.  Am. Compl. [ECF No. 7] ¶ 4.  Allan Block alleges that the two corporate Defendants—Shoreline Stone Manufacturing Carib, Inc., and Shoreloc Design Group, Inc.—were or are incorporated under Florida law and maintain their principal places of business there.  *Id.* ¶¶ 5–6.  And Allan Block alleges that the individual Defendants are Florida citizens.  *Id.* ¶¶ 7–8.  In support of their motion, Defendants seemed to echo these allegations, asserting they are "all from Florida."  ECF No. 18 at 1.  And the amount in controversy exceeds the $75,000 statutory threshold.  28 U.S.C. § 1332(a).  In addition to "actual and compensatory damages of at least $75,000," Allan Block seeks punitive damages, treble damages, and attorneys' fees.  Am. Compl. at 27, ¶¶ 5–6, 8–9.

Allan Block gave Shoreline a license and confidential information necessary for Shoreline to manufacture Allen Block's proprietary retaining-wall blocks in Florida.  Allan Block alleges that, after the contract was terminated, Shoreline's principals, Defendants Joann and Jason Stell, created a new entity, Defendant Shoreloc Design Group Inc.  Allan Block claims that Defendants misappropriated the confidential information Allan Block shared originally with Shoreline to enable Shoreloc to manufacture and sell knock-offs of Allan Block's retaining-wall blocks.  Allan Block asserts a breach-of-contract claim against Shoreline and intentional-tort claims against all Defendants.

Defendants seek the case's dismissal for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  The result is a mixed bag.  The motion will be denied with respect to Shoreline because a reasonable fact-finder could conclude that it created and maintained personal-jurisdiction-prompting Minnesota contacts arising from its contract with Allan Block.  The motion will be granted as to the Stells and Shoreloc.  As a matter of law on this record, they did not have sufficient Minnesota contacts to warrant the exercise of personal jurisdiction here.  Nor is the exercise of personal jurisdiction appropriate as to the Stells or Shoreloc on an "effects test" or conspiracy-based theory.

$$I^2$$

Allan Block "designed, developed, and engineered proprietary, interlocking concrete products." ECF No. 25 ¶ 3. These include retaining-wall blocks that "feature a raised lip at the top of each block and a corresponding notch at the bottom." *Id.* This design allows the blocks to be "stacked without mortar." *Id.* The retaining-wall blocks are "available to customers throughout the United States and internationally." *Id.* ¶ 4. Allan Block "works with a network of concrete-manufacturer companies to produce" its retaining-wall blocks, and it works with construction professionals to install them. *Id.*

Joann and Jason Stell are a married couple. ECF No. 19 ¶ 2; ECF No. 20 ¶ 2. Joann "was the sole shareholder, and owner of all rights, title, and interest in Shoreline." ECF No. 19 ¶ 4. Joann and Jason acted as "principals of Shoreline." ECF No. 25 ¶ 5. In the summer of 2018, the Stells "approached the President of Allan Block, Tim Bott . . . to inquire about becoming a producer of Allan Block retaining-wall blocks in Florida." Am. Compl. [ECF No. 7] ¶ 22; *see* ECF No. 25 ¶ 6. "As the Stells and Allan Block discussed a potential contractual, business relationship, Allan Block invited the Stells to travel to Minnesota to receive first-hand training on sales of Allan Block products—through a program Allan Block referred to as 'Allan Block University.'" Am. Compl. ¶ 23; *see* ECF

---

[2]   When, as here, parties rely on declarations and other evidentiary submissions to support or oppose a motion challenging personal jurisdiction, "and the district court relies on the evidence, the motion is in substance one for summary judgment." *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015) (citation modified). Consistent with this standard, the facts are described in a light most favorable to Allan Block. Page citations are to pagination assigned by the court's CM/ECF system, appearing in a document's upper right corner, not to a document's original pagination.

No. 25 ¶ 7.  "On July 25 and 26, 2018, the Stells traveled to Minnesota and attended "ABU [for Allan Block University] Advanced Retaining Walls – for the Commercial Market." ECF No. 25 ¶ 7; *see* ECF No. 19 ¶¶ 10–11; ECF No. 20 ¶¶ 10–11.  In addition to attending this course, the Stells' Minnesota trip was intended "to advance negotiations and arrangements for the parties' impending contractual relationship, including arranging a meeting in Minnesota between the Stells and Besser, an industrial concrete equipment company that the Stells hoped to use to source machinery for their plant in Florida."  ECF No. 25 ¶ 7.

On November 9, 2018, Allan Block and Shoreline "entered into the Allan Block Corporation Production Agreement."  *Id.* ¶ 10; *see* ECF No. 25-1 at 28–41.  The Agreement gave Shoreline an exclusive license to use Allan Block's proprietary technology to manufacture retaining-wall blocks in Florida and a non-exclusive license to sell the blocks in Florida and other places.  ECF No. 25-1 at 28–29.[3]  The Agreement's initial term was for three years.  *Id.* at 29.

The Agreement demanded a lot of Shoreline.  Among other things, the Agreement required Shoreline to manufacture the blocks at its expense, to pay for and distribute marketing and promotional materials prepared by Allan Block, to pay Allan Block royalty fees, to "assume responsibility for all local and national taxes and other fees relating to

---

[3]    In her declaration, Joann testified that "the Agreement contained a territorial limitation for sales in Central Florida."  ECF No. 19 ¶ 8.  This is not true.  The Agreement included this provision: "Producer agrees that it shall have no right to manufacture the Blocks at any location other than the Plants whether inside or outside the Territories. *Producer may, however, sell the Blocks either within or outside the Territories.*"  ECF No. 25-1 at 28 (emphasis added).

royalty payments," to pay interest on unpaid royalties, and to maintain "books and records of all Blocks manufactured and sold . . . , and the gross receipts earned therefrom for at least six (6) years from the date of sale," and allow Allan Block to inspect those books and records on "at least five (5) days prior written notice." *Id.* If Shoreline ran into production or quality-control problems, the Agreement required Shoreline to pay Allan Block "to provide additional technical assistance." *Id.* at 30. The Agreement required Shoreline to maintain the confidentiality of certain technical information it received from Allan Block, and this requirement survived the Agreement's termination. *Id.* The Agreement required Shoreline to "**use its best efforts to promote and create a demand for the Blocks**" in Florida. *Id.* at 31. The Agreement required Shoreline to take several onerous steps in connection with the blocks' manufacturing, including the following:

> 10.1   Producer agrees to make available out of its current production capacity, sufficient resources of space, equipment, material and personnel necessary to meet the sales goals as defined in the annual Sales and Marketing Plan. Producer will use its best efforts to meet requests for Block demand in excess of the forecasted sales goals. Producer will notify Licensor if product inventories are not able to meet demands. Delays in excess of five business days for product based on lack of inventory for stock materials or inadequate delivery capabilities shall be classified as not meeting this provision if the annual sales goals are not met. Producer must document if and when delays in excess of five days occur and provide a monthly summary with their sales and royalty report. In the event Producer is deemed unable to consistently meet product supply demands in the Territory, Licensor reserves the right to license alternative Producers in the Territory with the ability and capacity to manufacture and supply Blocks.
>
> 10.2   Producer agrees to commence commercial operation and production of Blocks at the Plants within the Territories within six (6) months of the date of this Agreement.

Throughout the term of this Agreement, Producer shall use its best efforts to maintain an adequate inventory of Blocks at its Plants. All costs associated with Producer's manufacture and sale of the Blocks, including but not limited to tooling, and implementation and use of the Molds and Technology, shall be the sole responsibility of Producer.

10.3    Producer shall at all times cooperate to the full extent required by Licensor to meet and comply with Licensor's Product Control Standards as set forth on Exhibit C. Licensor retains the right to amend Exhibit C from time to time, which amendments shall be binding on Producer as if included therein initially. Producer shall permit Licensor's agents to conduct field checks in the Plants and to enter the same at any time during working hours to inspect the premises, equipment and materials used in manufacturing the Blocks.

10.4    Producer shall annually submit a random sample of representative Blocks to an independent and capable laboratory for compressive strength, freeze thaw, absorption testing, and other tests as added to the Product Control Standards. Producer shall provide Licensor with a copy of such laboratory's written report within thirty (30) days of such testing. Such testing shall be at Producer's expense. Should the report disclose deficiencies as required by the Product Control Standards, Producer shall immediately take corrective action and resubmit representative Blocks for a second test within thirty (30) days. If the second report discloses deficiencies, Licensor will have the right to terminate this Agreement immediately. These test reports are due on or before March 1 of each New Year.

*Id.* at 31–32. For eighteen months after termination, the Agreement forbade Shoreline from "directly or indirectly engag[ing] in the manufacture and/or sale of any other mortarless, stackable, block wall products" in Florida without Allan Block's written consent. *Id.* at 34. And the Agreement required Shoreline to "purchase and keep in force general liability and products liability insurance" in a "form reasonably required by" Allan Block and with "limits of not less than $2,000,000." *Id.* at 32.

6

"Once the Agreement was reached, Allan Block provided to Shoreline all of the Confidential Information . . . for Shoreline's use in carrying out its obligations under the Agreement."  Am. Compl. ¶ 56; *see* ECF No. 25 ¶ 13.  Allan Block provided "detailed descriptions and in-depth illustrations and diagrams of the processes that Allan Block had developed for successful production and installation of the Blocks, step-by-step guides for avoiding problems and maximizing the utility and value of the Technology, and proprietary Block-installation methods that Allan Block had refined over time."  Am. Compl. ¶¶ 57; *see* ECF No. 25 ¶ 13.

The Agreement did not last long.  Shoreline did not begin commercial operation and production of blocks within the six-month period the Agreement required, *see* ECF No. 25-1 at 31, and for that reason Allen Block terminated the Agreement effective July 1, 2019, ECF No. 25 ¶ 16.  Shoreline was dissolved effective June 30, 2021.  Am. Compl. ¶ 81.

In late November 2022, Allan Block learned that the Stells were producing "knock-offs of Allan Block's retaining-wall collection" through Shoreloc, allegedly using the confidential information Allan Block provided to Shoreline under the Agreement.  *Id.* ¶ 86; ECF No. 25 ¶ 18.  In December 2022, Allan Block wrote to the Stells and Shoreloc demanding that they "cease and desist" using Allan Block's confidential information "to produce and sell retaining-wall blocks and related products."  ECF No. 25 ¶ 18.

In Allan Block's account, the cease-and-desist letter was not effective.  Allan Block attests that, through Shoreloc, the Stells continued to manufacture, market, and sell knock-offs of Allan Block's retaining-wall blocks using confidential information they

obtained through the Allan Block/Shoreline Agreement. *Id.* ¶ 19. Between July 2024 and May 2025, Shoreloc sent emails from the Stells' Shoreloc accounts soliciting a Minnesota company "about producing Shoreloc's knockoff blocks in Minnesota" and soliciting business from other companies. *Id.*

Allan Block asserts nine claims in this case. These include: (1) a breach-of-contract claim against Shoreline, Am. Compl. ¶¶ 97–105 (Count I); (2) a conversion claim against Shoreline, *id.* ¶¶ 106–14 (Count II); (3) a claim for aiding and abetting conversion against the Stells and Shoreloc, *id.* ¶¶ 115–23 (Count III); (4) a civil-theft claim under Minnesota Statutes section 604.14, subdivision 1, against Shoreline, *id.* ¶¶ 124–29 (Count IV); (5) a claim for aiding and abetting civil theft in violation of Minnesota Statutes section 604.14, subdivision 1, against the Stells and Shoreloc, *id.* ¶¶ 130–39 (Count V); (6) a claim for receiving stolen property in violation of Minnesota Statutes section 609.53, subdivision 1, against all Defendants, *id.* ¶¶ 140–45 (Count VI); (7) a civil-conspiracy claim against all Defendants, *id.* ¶¶ 146–48 (Count VII); (8) an unjust-enrichment against all Defendants, *id.* ¶¶ 149–52 (Count VIII); and (9) an unfair-competition claim against all Defendants, *id.* ¶¶ 153–57 (Count IX). Though the Amended Complaint isn't always explicit, it seems the non-statutory claims are asserted under Minnesota law.

## II

Personal jurisdiction "is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (citation modified). "When personal jurisdiction is challenged by a defendant, the plaintiff bears the burden to show that

jurisdiction exists." *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014). "To successfully survive a motion to dismiss challenging personal jurisdiction, a plaintiff must make a prima facie showing of personal jurisdiction over the challenging defendant." *Id.* "But where, as here, the parties submit affidavits to bolster their positions on the motion, and the district court relies on the evidence, the motion is in substance one for summary judgment." *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015). At this summary-judgment-equivalent stage, a case "should not be dismissed for lack of personal jurisdiction if the evidence, viewed in the light most favorable to [the plaintiff], is sufficient to support a conclusion that the exercise of personal jurisdiction over [the defendant] is proper." *Id.*

For the exercise of personal jurisdiction to be proper, it must comport with both the forum state's long-arm statute and due process. *Id.*; *see* Fed. R. Civ. P. 4(k)(1)(A); *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Because Minnesota's long-arm statute, Minn. Stat. § 543.19, is "coextensive with constitutional limits," this two-part issue boils down to one: whether the exercise of personal jurisdiction comports with due process. *Johnson v. Woodcock*, 444 F.3d 953, 955 (8th Cir. 2006). Due process requires that a defendant have sufficient "minimum contacts" with the forum state so that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Daimler AG*, 571 U.S. at 126 (citation modified). This means "actions by the defendant[s]" themselves must "create a substantial connection with the forum State" and provide "fair warning" to defendants that they may be subject to jurisdiction there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 475 (1985) (citation modified). The "fair warning" requirement will be

met if defendants have "'purposefully directed' [their] activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp.*, 471 U.S. at 472–73 (first quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984), and then quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

In the run-of-the-mill personal-jurisdiction analysis, a plaintiff must show the presence of minimum contacts for each defendant individually. *See Sahm v. Avow Corp.*, 705 F. Supp. 3d 925, 934 (E.D. Mo. 2023) ("Pleadings that indiscriminately lump defendants together in asserting jurisdictional allegations will not support finding personal jurisdiction over any one defendant." (citation modified)); *C. Pepper Logistics, LLC v. Lanter Delivery Sys., LLC*, No. 4:20-cv-01444-MTS, 2021 WL 3725680, at *4 (E.D. Mo. Aug. 23, 2021) ("[T]he bulk of Plaintiff's allegations involving him are vague and conclusory allegations in which he is simply lumped in with the other Defendants."); *Borislow v. Canaccord Genuity Grp. Inc.*, No. 14-80134-CIV, 2014 WL 12580259, at *5 (S.D. Fla. June 27, 2014) (noting "it is insufficient to indiscriminately lump defendants together in asserting jurisdictional allegations" (citation modified)); *Head v. L.V. Sands, LLC*, 298 F. Supp. 3d 963, 973 (S.D. Tex. 2018) ("[A] plaintiff must submit evidence supporting personal jurisdiction over each defendant, and cannot simply lump them all altogether."); *Spin Master Ltd. v. >TC Toy City Store*, No. 22 Civ. 890 (AT), 2022 WL 17669432, at *3 (S.D.N.Y. Dec. 14, 2022) ("Plaintiff improperly makes allegations as to personal jurisdiction over Defendants as a group."); *Cenage Learning, Inc. v. Buckeye*

10

*Books*, 531 F. Supp. 2d 596, 599 (S.D.N.Y. 2008) ("Lumping all the 'defendants' together for purposes of alleging connections to New York is . . . patently insufficient.").

Our Eighth Circuit Court of Appeals has identified five factors that district courts are to consider in determining whether a defendant has sufficient minimum contacts with the forum state to justify a finding of personal jurisdiction: (1) the nature and quality of contacts with the forum state; (2) the quantity of those contacts; (3) the relationship between the cause of action and the contacts; (4) the state's interest in providing a forum for its residents; and (5) the convenience to the parties. *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010). The first three factors are of primary importance. *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996). "In determining whether there is personal jurisdiction, the courts consider the defendant's contacts with the forum in the aggregate, not individually; they look at the totality of the circumstances." *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1388 (8th Cir. 1995).

Allan Block's front-line position is that applying these factors shows there is personal jurisdiction over each Defendant in Minnesota. I agree regarding Shoreline, but not regarding the Stells or Shoreloc.

Begin with Shoreline. The nature and quality of its Minnesota contacts were substantial. "A contract between a plaintiff and an out-of-state defendant is not sufficient in and of itself to establish personal jurisdiction over the defendant in the plaintiff's forum state." *K–V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 593 (8th Cir. 2011). However, a contract is ordinarily "an intermediate step serving to tie up prior business

11

negotiations with future consequences which themselves are the real object of the business transaction." *Id.* (quoting *Burger King Corp.*, 471 U.S. at 479). "To determine whether a defendant purposefully established minimum contacts with the forum, [the district court] must evaluate 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Creative Calling*, 799 F.3d at 980 (quoting *Burger King Corp.*, 471 U.S. at 479).

Here, Shoreline contracted with a Minnesota-based corporation, and the Agreement included numerous terms that imposed significant obligations on Shoreline. *See* ECF No. 25-1 at 28–41. Several of these obligations were Minnesota-connected. Shoreline was required to provide regular payments, accounting statements, an annual sales and marketing plan, and other documentation to Allan Block in Minnesota. *See id.* at 29, 31. All information necessary for Shoreline to comply with the Agreement's manufacturing requirements came from Allan Block in Minnesota. *See id.* at 30. And the Agreement tethered Shoreline to Allan Block for an ongoing, relatively lengthy period. It contained a minimum three-year term—that is, absent default, neither party could terminate the Agreement before three years had run from November 9, 2018. ECF No. 25-1 at 28–29, 33. Other provisions survived the Agreement's termination, *see id.* at 30, 34, and at least one of these—the confidentiality provision—appears to remain in force today, *id.* at 30 ("The termination of this Agreement shall not affect Producer's duty to protect the Confidential Information disclosed under this Agreement."). Finally, the Agreement contained a Minnesota choice-of-law clause. *Id.* at 35. Though a choice-of-law provision cannot independently confer personal jurisdiction over a non-resident defendant, *see CHS*

*Inc. v. Farmers Propane Inc.*, 397 F. Supp. 3d 1324, 1330 (D. Minn. 2019), it is relevant to the personal jurisdiction question, *see Patrick's Rest., LLC v. Singh*, No. 18-cv-764 (ECT/KMM), 2019 WL 2869082, at *8 (D. Minn. July 3, 2019) (citing cases).  To borrow from the Supreme Court's *Burger King* decision, "in light of [Shoreline's] voluntary acceptance of the long-term and exacting regulation of [its] business from [Allan Block's Minnesota] headquarters, the quality and nature of [its] relationship to the company in [Minnesota] can in no sense be viewed as random, fortuitous, or attenuated."  471 U.S. at 480 (citation modified); *see Blue Cross & Blue Shield of N.C. v. Rite Aid Corp.*, 519 F. Supp. 3d 522, 536 (D. Minn. 2021) (finding that "continuing obligations" imposed by parties' contract supported exercise of personal jurisdiction (citing *Burger King Corp.*, 471 U.S. at 474–76)).  Apart from showing the nature and quality of Shoreline's contacts, the Agreement established a relationship in which Shoreline would have been required to have frequent contact with Allan Block in Minnesota.  And there is an obviously direct relationship between the contacts and this case—Allan Block sued Shoreline for violating obligations imposed by the Agreement.  For these reasons, a fact-finder reasonably could conclude that a Minnesota court has personal jurisdiction over Shoreline in this case.

As a matter of law, the Stells are situated differently.  Neither Joann nor Jason was a party to the Agreement.  One of them signed the Agreement on Shoreline's behalf.  ECF No. 25-1 at 35.  Regardless, the fact that neither of the Stells was a party to the Agreement means the Agreement imposed no obligations on them personally, and the nature and quality of the Stells' Minnesota contacts cannot be measured by obligations the Agreement imposed on Shoreline.  Looking beyond the Agreement, the Stells' visits to Minnesota

13

lacked a nature or quality that might justify the exercise of personal jurisdiction over them here.  Joann and Jason visited Minnesota for a training course—Joann once in July 2018, and Jason once in July 2018 and once again in December 2018.  ECF No. 25 ¶¶ 7, 11.  It is difficult to understand how attendance at a two-day training course—or two of them— might be of a nature or quality sufficient to trigger personal jurisdiction.  The courses were not lengthy.  This case did not arise out of the courses or anything that happened in connection with them.  And Allan Block does not explain how information that the Stells might have learned in these courses holds significance to Allan Block's claims.  The quantity of the Stells' Minnesota contacts was also insubstantial.  Apart from Joann and Jason's three Minnesota training-course visits, the record includes a handful of emails between the Stells on Shoreline's behalf and representatives of Allan Block, and emails sent by the Stells on Shoreloc's behalf to one or two Minnesota entities other than Allan Block.  By any reasonable measure, these do not represent a quantity that might trigger personal jurisdiction over the Stells in Minnesota.[4]  Allan Block has identified no meaningful relationship between the Stells' Minnesota contacts and its claims in this case.  Allan Block's claims arise out of Defendants' alleged sharing and use of Allan Block's confidential information.  These claims have little (if anything) to do with the Stells'

---

[4]    In a declaration, Allan Block's President and Chief Executive Officer, Robert Gravier, testified that the Stells exchanged "over 150 emails" with Bott between 2013 and July 1, 2019.  ECF No. 25 ¶ 21.  Allan Block nowhere describes the content of these emails or how many were sent by Joann versus Jason.  Without more, I cannot assess whether these emails, either by virtue of their quality or quantity, might enable a reasonable fact-finder to conclude that there is personal jurisdiction over the Stells—or perhaps one of them—in Minnesota.

attendance at the training courses or the emails the Stells sent on Shoreline's behalf to Allan Block. The emails the Stells sent on Shoreloc's behalf may have contributed to Allan Block's discovery of its claims, but those emails are tertiary to claims that the Stells improperly enabled Shoreloc to use Allan Block's confidential information. The issue, in other words, is whether Shoreline and the Stells improperly enabled Shoreloc to manufacture and sell knock-off products; the issue is not whether Shoreloc solicited customers, as the emails tend to show. On the Amended Complaint's allegations and this evidentiary record, no reasonable juror could find that the exercise of personal jurisdiction over the Stells in Minnesota is proper.

The same conclusion holds for Shoreloc. It was not a party to the Agreement between Shoreline and Allan Block. No evidence shows when the entity was formed, but it didn't enter the picture until November 2022. After that, its Minnesota contacts consist of emails it sent to two Minnesota-based companies in 2024, three to "Amcon" dated July 29, October 30, and November 5, and one to "TCC Materials" sent before May 13. *See* ECF No. 25 ¶ 19; ECF No. 25-1 at 96–113. The emails tout the advantages of Shoreloc retaining-wall systems and solicit business. See ECF No. 25-1 at 97–99. These emails do not possess a nature or quality that might contribute to showing personal jurisdiction over Shoreloc in Minnesota. They solicit business. They do not show any business was consummated. They do not show the establishment of any enduring relationship between Shoreloc and a Minnesota-based entity. The quantity of these emails is minimal; we have less than five. And again, it is difficult to identify a material relationship between the

15

Shoreloc emails and Allan Block's claims.   The claims do not arise out of these solicitations.

Allan Block has two fallback positions.  It first relies on the *Calder* "effects test," which the Eighth Circuit has described as an "additional factor" to be considered in intentional-tort cases.  *Kendall Hunt Publ'g Co. v. The Learning Tree Publ'g Corp.*, 74 F.4th 928, 931 (8th Cir. 2023); *see Calder v. Jones*, 465 U.S. 783, 789 (1984).  As the Eighth Circuit has described it, the *Calder* effects test requires a plaintiff to show the presence of three elements: (1) that a defendant's acts were intentional; (2) that the acts "were uniquely or expressly aimed at the forum state"; and (3) that the acts "caused harm, the brunt of which was suffered—and which the defendant knew likely was to be suffered—[in the forum state]."  *Kendall Hunt Publ'g*, 74 F.4th at 931 (quoting *Brothers & Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 954 (8th Cir. 2022)).  The Eighth Circuit "construe[s] the *Calder* effects test narrowly" in the sense that "mere effects in the forum state are insufficient to confer personal jurisdiction."  *Arden*, 614 F.3d at 797.

Allan Block has not shown that the *Calder* effects test might justify the exercise of personal jurisdiction over the Stells and Shoreloc in Minnesota.  Nothing shows these Defendants' actions were uniquely or expressly aimed at Minnesota.  *Calder*'s second element requires that a defendant deliberately create "contacts with the forum State itself," not merely "contacts with persons who reside there."  *Walden v. Fiore*, 571 U.S. 277, 285 (2014).  "To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties.  But a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for

16

jurisdiction." *Id.* at 286; *see WTAS, LLC v. W. Tenn. Air Serv., LLC*, No. 23-CV-2015 CJW-MAR, 2023 WL 3778716, at *4, *6–7 (N.D. Iowa Apr. 24, 2023). Allan Block has not shown that the Stells or Shoreloc deliberately created Minnesota contacts to carry out their alleged misappropriation of Allan Block's confidential information. Allan Block does not allege that the Stells' and Shoreloc's suit-provoking activities were limited to Minnesota, and the only rational understanding of the Amended Complaint's allegation that Defendants "produce[d] slightly modified versions of" Allan Block's products is that this was not done with just Minnesota in mind. Am. Compl. ¶ 100; *see Kendall Hunt Publ'g Co.*, 74 F.4th at 931; *Ecolab Inc. v. IBA, Inc.*, No. 22-cv-479 (ECT/DTS), 2023 WL 7091853, at *7 (D. Minn. Oct. 26, 2023). All that remains is Allan Block's contention that the Stells and Shoreloc knew Allan Block was in Minnesota and knew Allan Block would be injured in Minnesota because of their outside-of-Minnesota acts. This is insufficient to confer jurisdiction. *See Walden,* 571 U.S. at 290 ("[M]ere injury to a forum resident is not a sufficient connection to the forum."); *see also Ecolab*, 2023 WL 7091853, at *7.

Second, Allan Block relies on the "conspiracy theory of personal jurisdiction." The idea behind conspiracy-based jurisdiction is simple enough:

> As a matter of substantive law, a conspirator who performs an act in furtherance of the conspiracy does so as an agent for his co-conspirators. Plaintiffs have begun to argue that because co-conspirators are each other's agents for purposes of liability and the act of an agent in the forum state may establish jurisdiction, they need only allege contacts sufficient for one defendant to obtain jurisdiction over all co-conspirators.

Ann Althouse, *The Use of Conspiracy Theory to Establish In Personam Jurisdiction: A Due Process Analysis*, 52 Fordham L. Rev. 234, 235 (1983) (footnote omitted). It seems

17

reasonable to question whether the Minnesota Supreme Court recognizes the doctrine. Long ago, it interpreted Minnesota's long-arm statute to authorize conspiracy-based personal jurisdiction. *Hunt v. Nev. State Bank*, 172 N.W.2d 292, 311 (Minn. 1969). In *Hunt*, the court explained:

> Once participation in a tortious conspiracy—the effect of which is felt in this state—is sufficiently established, actual physical presence of each of the alleged conspirators is not essential to a valid assertion of jurisdiction. This construction of our [long-arm] statute follows from the premise that the legislature intended the statute to reach as far as constitutional limitations would permit.

*Id.* The court, however, has since explained that Minnesota's "long-arm statute . . . does not confer jurisdiction whenever a tort is committed by a nonresident" with consequences in Minnesota, and that "due process . . . requires that 'minimum contacts' exist between the defendant and the forum state." *Kopperud v. Agers*, 312 N.W.2d 443, 445 (Minn. 1981); *see Stangel v. Rucker*, 398 N.W.2d 602, 606 (Minn. Ct. App. 1986) ("*Hunt* does not stand for the proposition that minimum contacts are unnecessary whenever a conspiracy with in-state effects are alleged, or that such an allegation is itself a sufficient showing of minimum contacts."). Regardless, federal courts in this district and elsewhere seem to apply consistent rules to determine whether a plaintiff has shown that exercising conspiracy-based personal jurisdiction comports with due process. Conspiracy-based personal jurisdiction "requires (1) the existence of a conspiracy; (2) the nonresident's participation in or agreement to join the conspiracy; and (3) an overt act taken in furtherance of the conspiracy within the forum's boundaries." *Eagle Creek Software Servs., Inc. v. Jones*, No. 14-cv-4925 (ADM/FLN), 2015 WL 1038534, at \*4 (D. Minn.

18

Mar. 10, 2015); *see Yellow Brick Rd., LLC v. Childs*, 36 F. Supp. 3d 855, 864 (D. Minn. 2014); *Peterson v. Wallace,* 622 F. Supp. 2d 791, 800–01 (D. Minn. 2008); *Personalized Brokerage Servs., LLC v. Lucius*, No. 05-cv-1663 (PAM/FLN), 2006 WL 208781, at \*5 (D. Minn. Jan. 26, 2006).  "[B]ald speculation or a conclusory statement that individuals are coconspirators is insufficient to establish personal jurisdiction under a conspiracy theory." *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1097 (D.C. Cir. 2008) (citation modified).[5]

---

[5]   Conspiracy-based jurisdiction seems susceptible to abuse.  After all, the United States Supreme Court has emphasized that "the defendant's suit-related conduct must create a substantial connection with the forum State," and that "the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden*, 571 U.S. at 284 (quoting *Burger King Corp.*, 471 U.S. at 475).  Of this concern, the Tenth Circuit has written:

> We recognize parties could potentially stretch the conspiracy cause of action to subvert the due process principles that govern personal jurisdiction.  We also acknowledge that personal jurisdiction requirements must be met as to each defendant.  But we cannot dismiss out of hand the [conspiracy-based] jurisdictional theory [the plaintiff] presents.  If three Kansans conspired to fire a cannonball into Oklahoma, we do not believe the Constitution would foreclose Oklahoma courts from exercising jurisdiction over the conspirators simply because they confined themselves to Kansas.

*Newsome v. Gallacher*, 722 F.3d 1257, 1265–66 (10th Cir. 2013) (citation modified); *see Stauffacher v. Bennett*, 969 F.2d 455, 459 (7th Cir. 1992) (recognizing the presence of "doubt . . . that the due process clause permits a state to assert extra-territorial jurisdiction over a person who did not foresee that the conspiracy which he joined would commit acts within that state," but holding that "[i]f through one of its members a conspiracy inflicts an actionable wrong in one jurisdiction, the other members should not be allowed to escape being sued there by hiding in another jurisdiction"), *superseded on other grounds by*, Fed. R. Civ. P. 4(k)(2), *as recognized in*, *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 941 (7th Cir. 2000)).

Allan Block's theory is that there is personal jurisdiction over the Stells and Shoreloc in Minnesota based on a conspiracy between them and Shoreline—or to put it another way, that Shoreline's sufficient-for-personal-jurisdiction Minnesota contacts should be imputed to the Stells and Shoreloc because of the conspiracy. This is not convincing. The argument depends on a conclusory statement that a conspiracy exists. The conspiracy allegation appears once in the Amended Complaint. *See* Am. Compl. ¶ 147. There, Allan Block alleges that "[t]he Stells, Shoreline, and Shoreloc worked together, i.e., conspired, to accomplish conversion, theft, and receipt of stolen property when they improperly retained, improperly took, improperly received, misappropriated, and misused Allan Block's Confidential Information and the knock-offs of Allan Block's retaining-wall-collection Blocks." *Id.*; *see* ECF No. 24 at 42 (relying on this statement to show a conspiracy). The Amended Complaint alleges no facts directed to supporting this assertion. And some of its allegations cut the other direction. It alleges, for example, that Shoreline "voluntarily dissolved in 2021." Am. Compl. ¶ 18. It is difficult to understand how an organization that ceased to exist in 2021 might plausibly be part of a conspiracy beginning in 2022. *See id.* ¶ 86. There is another problem. On the Amended Complaint's allegations, the Shoreline Minnesota contacts Allan Block wishes to attribute to the Stells and Shoreloc to show conspiracy-based personal jurisdiction had nothing to do with the

20

conspiracy. Shoreline's personal-jurisdiction-triggering Minnesota contacts concerned the Agreement and its formation, not some later-developed conspiracy.[6]

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendants' Joint Motion to Dismiss Plaintiff's Amended Complaint for Lack of Personal Jurisdiction [ECF No. 15] is **GRANTED IN PART AND DENIED IN PART** as follows:

1.     The Motion is **GRANTED WITHOUT PREJUDICE** with respect to Defendants Shoreloc Design Group Inc., Jason Stell, and Joann Stell.

2.     The Motion is **DENIED** in all other respects.

Dated:  May 26, 2026                          s/ Eric C. Tostrud
                                              Eric C. Tostrud
                                              United States District Court

---

[6]     Allan Block alleges the legal conclusion that Shoreline and Shoreloc each is an alter ego of the other, Am. Compl. ¶ 85, but it does not argue that alter-ego liability justifies the exercise of personal jurisdiction over Shoreloc.